**26-50226**

# IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

| | |
|---|---|
| DR. JANE DOE,<br>*Plaintiff-Appellant*<br>v.<br>UNIVERSITY OF TEXAS AT SAN ANTONIO,<br>SCHOOL OF DENTISTRY; DR. KENNETH M. HARGREAVES; DR. MARIA KARAKOUSOGLOU;<br>and other faculty defendants in their official capacities,<br>*Defendants-Appellees* | On Appeal from the United State District Court for the Western District of Texas, San Antonio Division<br>District Court No. SA-25-CA-01140-XR<br>The Honorable Xavier Rodriguez, United States District Judge |

## BRIEF OF PLAINTIFF-APPELLANT DR. JANE DOE

Adam Lamparello
Counsel for Plaintiff–Appellant
Lamparello Law, Education, & Advocacy
201 Berkshire Road
Hasbrouck Heights, New Jersey 07604
(201) 317-5115
adam@lamparello-law.com

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following persons and entities, as described in Fifth Circuit Rule 28.2.1, have an interest in the outcome of this appeal. These representations are made so that the judges of this Court may evaluate possible disqualification or recusal.

1. Dr. Jane Doe

   Plaintiff–Appellant.

2. University of Texas at San Antonio, School of Dentistry

   Defendant–Appellee.

3. Dr. Kenneth M. Hargreaves

   Defendant–Appellee

4. Dr. Maria Karakousoglou

   Defendant–Appellee

5. Individual Faculty Defendants–Appellees:

   Dr. Sandra Andari

   Dr. Shaza Abass

   Dr. Vishnu Raj

Dr. Ravikumar Anthony

Dr. Nikita Ruparel

Dr. Suman Challa

Dr. Joshua Stone

Dr. Elva Jordan

Dr. Angela Palaiologou-Gallis

Dr. Soo Cheol Jeong

Dr. Hassem Geha

6. University of Texas System

   Parent governmental entity of the University of Texas at San Antonio.

7. Cory A. Scanlon, Esq. and Sheaffer K. Fennessey

   Counsel for Defendants–Appellees

8. Adam Lamparello, Esq.

   Counsel for Plaintiff–Appellant

The undersigned further certifies that no publicly traded corporation or other publicly held entity owns 10% or more of any party's stock, and no publicly traded

corporation or other publicly held entity has a financial interest in the outcome of this litigation.

Respectfully submitted,

/s/ Adam Lamparello
Adam Lamparello, Esq.
Counsel for Plaintiff-Appellant

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiff–Appellant Dr. Jane Doe respectfully requests oral argument. This appeal presents important and recurring questions concerning the standards governing dismissal with prejudice of an initial complaint based on futility, the proper application of Rule 12(b)(6) where the characterization of a university dismissal is disputed, and the scope of prospective relief available under *Ex parte Young*.

Oral argument would assist the Court in determining whether a district court may dismiss an initial civil rights complaint with prejudice based on a conclusory finding of futility without analyzing whether additional factual allegations could cure the perceived pleading deficiencies. The appeal also presents the related question whether, at the pleading stage, a court may treat a dismissal as purely academic as a matter of law despite allegations that the operative notice rested on accusations of dishonesty, policy violations, and other conduct-based grounds.

Finally, this appeal raises an important question concerning the application of *Jackson v. Wright* in the university context: whether officials who continue to administer, maintain, or enforce the consequences of the challenged actions possess a sufficient connection to ongoing injuries to permit prospective relief under *Ex parte Young*.

Because the appeal concerns recurring procedural and constitutional issues that extend beyond the particular facts of this case, oral argument would materially assist the Court's resolution of the questions presented.

# TABLE OF CONTENTS

**Page**


Certificate of Interested Persons ........................................................................ ii

Statement Regarding Oral Argument .......................................................................v

Table of Contents ................................................................................................ vii

Table of Authorities ...............................................................................................x

Statement of Jurisdiction........................................................................................1

Issues Presented .....................................................................................................1

Introduction ............................................................................................................2

Statement of the Case..............................................................................................4

A. Nature of the Action and Proceedings Below.................................................4

B. Dr. Doe's Academic and Scientific Background ............................................5

C. The Dispute Over Dr. Doe's Federally Protected Research Time..................5

D. The Remediation and Probation Proceedings .................................................6

E. The Dean's Written Concerns About Due Process .........................................7

F. The Probation Hearing and Committee Irregularities .....................................8

G. Dismissal on a Shifting Factual Basis.............................................................8

H. The Ongoing Consequences ...........................................................................9

Standard of Review...............................................................................................10

Summary of the Argument....................................................................................11

Argument....................................................................................................14

I. The District Court Abused Its Discretion by Dismissing the Initial Complaint with Prejudice Based on a Conclusory and Mechanistic Futility Determination....14

A. Futility Was the Sole Basis for the District Court's With-Prejudice Dismissal ....................................................................................................14

B. The District Court Conflated Pleading Deficiencies with Futility ................15

C. The Available Additional Allegations Demonstrate Why Amendment Could Not Properly Be Deemed Futile ....................................................................16

D. Prior Counsel's Failure to Request Leave to Amend Does Not Alter the Futility Analysis or Justify With-Prejudice Dismissal ......................................20

II. The District Court Erred by Characterizing Dr. Doe's Dismissal as Purely Academic and Invoking Academic Deference at the Pleading Stage .....................21

A. The Complaint Plausibly Alleged a Conduct-Based or Mixed Dismissal ....22

B. Horowitz Should Not Govern as a Matter of Law........................................23

C. Dr. Doe Plausibly Alleged Protected Property and Liberty Interests...........25

D. The Complaint Plausibly Satisfied All Three *Mathews* Factors....................28

III. The District Court Applied an Unduly Narrow View of Article III Redressability Under Ex parte Young ..................................................................30

A. Article III and Ex parte Young Do Not Require Unilateral Authority..........31

B. The Complaint Plausibly Alleged the Requisite Connection to Ongoing Injuries ..........................................................................................................32

C. The Requested Relief Is Prospective and Permissible Under Ex parte Young ....................................................................................................34

D. Neither *Whole Woman's Health v. Jackson* Nor *City of Austin v. Paxton* Supports Dismissal ..........................................................................35

Conclusion ........................................................................................................37

Certificate of Service ........................................................................................39

Certificate of Compliance ..................................................................................40

# TABLE OF AUTHORITIES

**Cases**

**Page(s)**

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................................ 11, 22

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................ 10-11, 22

*Board of Curators of the Univ. of Mo. v. Horowitz*, 435 U.S. 78 (1978) ........*passim*

*Board of Regents of State Colleges v. Roth*, 408 U.S. 564 (1972) .............25, 26, 27

*City of Austin v. Paxton*, 943 F.3d 993 (5th Cir. 2019) .................................... 36-37

*Dixon v. Alabama State Board of Education*, 294 F.2d 150 (5th Cir. 1961) ....12, 24

*Ex parte Young*, 209 U.S. 123 (1908) ...........................................................*passim*

*Fernandez-Montes v. Allied Pilots Ass'n*, 987 F.2d 278 (5th Cir. 1993) ..........10, 22

*Foman v. Davis*, 371 U.S. 178 (1962) ...................................................................14

*Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*,
528 U.S. 167 (2000) ..........................................................................................31

*Goss v. Lopez*, 419 U.S. 565 (1975) ...............................................................12, 24

*Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*,
313 F.3d 305 (5th Cir. 2002) .......................................................................11, 14, 20

*Hitt v. City of Pasadena*, 561 F.2d 606 (5th Cir. 1977)...................................*passim*

*Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.*,
920 F.3d 890 (5th Cir. 2019) ...............................................................................10

*Jackson v. Wright*, 82 F.4th 362 (5th Cir. 2023) ............................................*passim*

*Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n*,
751 F.3d 368 (5th Cir. 2014) .........................................................................11

*Mathews v. Eldridge*, 424 U.S. 319 (1976) ...................................................*passim*

*Nelson v. University of Texas at Dallas*, 535 F.3d 318 (5th Cir. 2008) .................35

*Perry v. Sindermann*, 408 U.S. 593 (1972) ..........................................................26

*Pickett v. Texas Tech University Health Sciences Center*,
37 F.4th 1013 (5th Cir. 2022) ...................................................................26, 28

*Plummer v. University of Houston*, 860 F.3d 767 (5th Cir. 2017) .........................24

*Regents of University of Michigan v. Ewing*, 474 U.S. 214 (1985)..................26, 28

*Stripling v. Jordan Production Co*., 234 F.3d 863 (5th Cir. 2000).. ...............*passim*

*Whole Woman's Health v. Jackson*, 595 U.S. 30 (2021)................................. 36-37

**Constitutional Provisions**

U.S. Const. amend. XIV (Due Process Clause).......................................................1

**Statutes**

28 U.S.C. § 1291 ..........................................................................................1
28 U.S.C. § 1331 ..........................................................................................1
42 U.S.C. § 1983 ......................................................................................1, 4

**Regulations and Other Authorities**

2 C.F.R. Part 200 .......... 4
45 C.F.R. Part 75 .......... 4
NIH Grants Policy Statement .......... 4

**Rules**

Fed. R. App. P. 4(a)(1)(A) .......... 1
Fed. R. App. P. 32(a)(5)–(6) .......... 40
Fed. R. App. P. 32(a)(7)(B) .......... 40
Fed. R. App. P. 32(f) .......... 40
Fed. R. Civ. P. 12(b)(1) .......... 4, 10
Fed. R. Civ. P. 12(b)(6) .......... *passim*
Fed. R. Civ. P. 15(a)(2) .......... 38
Fifth Circuit Rule 28.2.1 .......... ii

## STATEMENT OF JURISDICTION

The district court had subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiff–Appellant asserted claims under 42 U.S.C. § 1983 and the Due Process Clause of the Fourteenth Amendment.

On February 19, 2026, the district court entered final judgment dismissing all claims with prejudice. ROA.536–538. Plaintiff–Appellant filed a timely notice of appeal on March 17, 2026, within the period prescribed by Federal Rule of Appellate Procedure 4(a)(1)(A). ROA.540-541.

This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED

1. Whether the district court abused its discretion by dismissing an initial complaint with prejudice on the ground of futility without determining whether additional factual allegations could cure the perceived pleading deficiencies.

2. Whether the district court erred at the Rule 12(b)(6) stage by treating Dr. Doe's dismissal as purely academic as a matter of law, despite allegations that the operative dismissal notice rested on accusations of dishonesty, policy violations, and other conduct-based grounds.

3. Whether university officials who participated in, implemented, administered, or continue to maintain the decisions and records underlying Dr. Doe's dismissal were properly dismissed under Article III and *Ex parte Young* where the complaint seeks prospective relief for ongoing injuries.

**INTRODUCTION**

Dr. Jane Doe did not arrive at UT Health San Antonio as an ordinary residency applicant. She arrived as a dentist-scientist—a DDS earned with honors, a Ph.D., a Harvard-affiliated postdoctoral fellowship, and a $1.57 million NIH Dentist-Scientist Pathway to Independence Award, the first such award in the School of Dentistry's history. The University understood what it was accepting. As a condition of her federally funded faculty appointment, it represented to the National Institutes of Health that her residency training would "not interfere with her research career development effort" and that seventy-five percent of her time would be protected for NIH-funded research. The arrangement was not informal. It was memorialized in writing, binding on the institution, and central to the federal grant that brought $1.57 million to the University.

That arrangement collapsed when Dr. Doe objected to a newly imposed master's thesis requirement that conflicted with her federally protected research obligations. What followed was a sequence of administrative proceedings that her own Dean described, in writing, as reflecting a "lack of due process—lack of

feedback, lack of documentation." ROA.28–29. The proceedings culminated in a July 11, 2025 Supplemental Notice that accused Dr. Doe of providing "misleading" and "inconsistent" information and engaging in "conduct inconsistent with program policies"—without identifying a single false statement, contradictory record, date, or policy violation to support those charges. ROA.31–32. Her appeal was denied. Her residency was terminated. Her federally funded research pathway was severed.

The district court never examined whether any of that was true. It dismissed the complaint at the threshold—before amendment, before discovery, before Dr. Doe could obtain the University's own records—on the ground that further proceedings would be futile. That single-sentence conclusion ended a plausibly pleaded constitutional challenge brought by a federally funded dentist-scientist whose dismissal, according to the complaint, rested on accusations her institution could not or would not substantiate.

This Court's review is limited to three questions: whether the district court could terminate an initial complaint with prejudice without analyzing whether amendment could cure its deficiencies; whether it could resolve the character of Dr. Doe's dismissal as a matter of law against the nonmovant at the pleading stage; and whether it could dismiss officials who remain connected to the ongoing consequences of that dismissal. The answers to all three questions are no.

# STATEMENT OF THE CASE

## A. Nature of the Action and Proceedings Below

Plaintiff–Appellant Dr. Jane Doe brought this action under 42 U.S.C. § 1983 after UT Health San Antonio dismissed her from its Orthodontics Residency Program. ROA.9–54. She seeks declaratory and prospective injunctive relief, including reinstatement to the residency program; restoration of the 75% protected research time and institutional support guaranteed by her employment contract and NIH Institutional Commitment Letter; and correction or expungement of the findings that accompanied her dismissal. Those obligations arise from federal grant requirements, including 2 C.F.R. Part 200, 45 C.F.R. Part 75, and the NIH Grants Policy Statement.

The complaint alleged that various faculty and administrative officials, acting under color of state law, deprived Dr. Doe of protected property and liberty interests without constitutionally adequate procedures. ROA.12–15, 37. Appellees moved to dismiss under Rules 12(b)(1) and 12(b)(6), asserting sovereign immunity, lack of redressability, and that the dismissal was purely academic. ROA.395. On February 19, 2026, the district court granted the motion and dismissed the complaint with prejudice. ROA.536. Dr. Doe filed a timely notice of appeal. ROA.540-541.

**B. Dr. Doe's Academic and Scientific Background**

Dr. Doe is a dentist-scientist with extensive academic and research credentials. She earned a B.S. in Biology, an M.S. in Biomedical Engineering, and a Ph.D. in Physiology and a DDS—graduating with honors in Research and Dental Education—from UT Health San Antonio. ROA.15. She then completed a four-year postdoctoral fellowship at The Forsyth Institute, affiliated with the Harvard School of Dental Medicine. See *id.*

In 2022, the National Institutes of Health awarded Dr. Doe a competitive NIDCR K99/R00 Dual Degree Dentist Scientist Pathway to Independence Award—the first such award in the School of Dentistry's history. ROA.16. She brought approximately $1.57 million in federal funding to the University. ROA.18. As a condition of that funding, the University represented to the NIH that Dr. Doe would receive 75% protected research time and that residency obligations would "not interfere with her research career development effort." ROA.18–19. During her first semester, Dr. Doe earned a 3.23 GPA and passed all didactic and clinical courses. ROA.20.

**C. The Dispute Over Dr. Doe's Federally Protected Research Time**

The conflict began on December 16, 2024 when Program Director Dr. Maria Karakousoglou informed Dr. Doe that she would be required to complete a master's degree and thesis as part of the residency program. ROA.21. Dr. Doe objected,

noting that her NIH-funded research project would satisfy the residency research requirement and that her offer letter stated that "[t]he Master's degree will be waived and that portion of time will be dedicated to your research efforts," and that the requirement would interfere with the 75% protected research time guaranteed by her NIH award. ROA.22. Dr. Karakousoglou declined to modify the requirement. After Dr. Doe raised her concerns through university channels, the conflict escalated into a series of administrative actions. ROA.22-35, ROA.155.

**D. The Remediation and Probation Proceedings**

On February 13, 2025, the Orthodontics Residency Oversight Committee ("OROC") placed Dr. Doe on an Initial Remediation Plan. ROA.23. The evaluations underlying the plan were vague and did not identify specific conduct or performance deficiencies. ROA.24–25.

On Friday, March 21, 2025, at approximately 5:00 p.m.—before the remediation period had concluded—the Advanced Education Committee ("AEC") Chair, Dr. Ahmed Sabbah, informed Dr. Doe that the OROC committee had recommended formal academic probation based on generalized concerns regarding her "didactic and clinical performance." ROA.27. The probation hearing was scheduled for the following Tuesday. Because the notice was provided after business hours on a Friday and the University was closed over the weekend, Dr. Doe had limited opportunity to obtain information, review records, or prepare a response.

ROA.27. She was not provided with the specific factual basis for the recommendation. See *id*.

Dr. Doe requested a brief extension and access to the educational and clinical records underlying the recommendation. Associate Dean Dr. Stephanie Seitz denied both requests and directed that the hearing proceed as scheduled. ROA.28. Dr. Seitz also referenced an unresolved "patient safety" concern that had not previously been disclosed through any written notice, clinical write-up, patient complaint, or other documentation. *Id*. No supporting documentation was provided before the hearing. See *id*. Dr. Doe therefore appeared before AEC without access to the records or specific allegations forming the basis for the recommendation. See *id*.

**E. The Dean's Written Concerns About Due Process**

Dr. Doe sought guidance from Dean Kenneth M. Hargreaves. ROA.28. After reviewing the record, Dean Hargreaves advised her to request the patient-safety documentation, clinical data, examination scores, and faculty evaluations underlying the proceedings. ROA.28. The next day, he wrote: "The question is not 'extenuating circumstances[.]' Rather, the question is lack of due process—lack of feedback, lack of documentation." ROA.28–29.

The University proceeded with the probation hearing without producing the requested records. ROA.29.

**F. The Probation Hearing and Committee Irregularities**

The AEC convened on March 25, 2025. ROA.29. When, at the beginning of the meeting, Dr. Doe stated she did not know why she was there Dr. Challa responded, "That's okay…." *Id.* When she asked for clarification, he merely responded it was due to substandard performance. After less than fifteen minutes of discussion, primarily concerning Dr. Doe's confusion about the accusations against her, she was excused from the meeting. See *id.*

The complaint alleges several procedural irregularities. For example, Dr. Soo Cheol Jeong participated in deliberations and cast a vote despite lacking authority to serve as a voting member under the Resident Training Manual and institutional bylaws, which limited voting membership to program directors. See *id*. Dr. Jeong was not an active program director. See *id.*

The complaint further alleges that Dr. Suman Challa participated in both the probation and dismissal proceedings after prior extensive communications with Dr. Karakousoglou regarding Dr. Doe's performance, while simultaneously serving as Interim Department Chair and Associate Dean for Advanced Education. See *id*. These allegations raise questions regarding neutrality and impartiality.

**G. Dismissal on a Shifting Factual Basis**

In August 2025, the University converted Dr. Doe's probation into a permanent dismissal. ROA.31, 34. By that time, however, she had been on approved

leave since March 28, 2025—just one day after being placed on probation—with paid leave continuing through June 22 and unpaid leave thereafter. ROA.30. The complaint alleges that she had no meaningful opportunity to satisfy probation conditions before termination, despite the probation being scheduled to remain in effect "until you successfully complete your residency training at the UT Health San Antonio School of Dentistry." *Id.*, ROA.191, 314.

The basis for dismissal had also shifted to disciplinary focus. The July 11, 2025 Supplemental Notice did not rely on grades or clinical performance. Instead, it accused Dr. Doe of "conduct inconsistent with program policies" and of providing "repeated inconsistencies and misleading information" regarding attendance, performance logs, and professional responsibilities. ROA.31–32. However, the University identified no specific false statement, contradictory record, date, or policy. ROA.33–34.

Dr. Doe appealed. The appeal was decided by Dean Hargreaves—the same administrator who had previously expressed due process concerns—and was denied without evidentiary review. ROA.35.

**H. The Ongoing Consequences**

The consequences of Dr. Doe's dismissal are substantial and ongoing. Her NIH career-development pathway was designed to integrate advanced clinical training with 75% protected research time. ROA.18, 19. Dismissal disrupted that

framework and jeopardized the long-term viability of her federally funded research. See *id*. The complaint alleges that without residency training, the duration of her R00 funding would reduce from five years to three years—eliminating two years of independent research support, as the five years is contingent upon concurrent residency training—and impair her ability to generate data, publish research, compete for grants, and progress toward tenure. ROA.49.

The findings of "inconsistent and misleading information" have damaged Dr. Doe's professional reputation and impaired her ability to obtain future residency placements, faculty appointments, and research funding. ROA.35, 43. The University's failure to provide the required protected research time from July 2024 through her dismissal further diminished her research productivity and competitiveness as an NIH-funded investigator. ROA.49.

These injuries are ongoing and cannot be fully remedied through monetary damages.

## STANDARD OF REVIEW

Dismissals under Rules 12(b)(1) and 12(b)(6) are reviewed *de novo*. See *Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 899 (5th Cir. 2019). At this stage, the Court must accept all well-pleaded factual allegations as true and draw all reasonable inferences in the plaintiff's favor. See *Fernandez-Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 284 (5th Cir. 1993). A

complaint survives dismissal when it pleads "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); see also *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

This Court has repeatedly cautioned that dismissal with prejudice at the pleading stage is improper where the identified defects may be curable and the plaintiff has not been afforded a meaningful opportunity to amend. See *Hitt v. City of Pasadena*, 561 F.2d 606, 608-609 (5th Cir. 1977); *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co*., 313 F.3d 305, 329 (5th Cir. 2002). Unlike *Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n*, where the plaintiff had already amended twice and sought a third amendment, Dr. Doe was dismissed at the threshold without any prior opportunity to cure. 751 F.3d 368, 378 (5th Cir. 2014).

Furthermore, futility is assessed under the Rule 12(b)(6) standard. Thus, futility exists only if the proposed amended pleading would fail to survive Rule 12(b)(6) scrutiny. See *id*.

## SUMMARY OF THE ARGUMENT

This appeal presents three independent grounds for reversal, each arising from a threshold legal error that foreclosed Dr. Doe's claims before the factual record could be developed.

First, futility is a forward-looking inquiry. It requires a determination that an amended complaint would fail to state a claim—not merely that the existing complaint fell short. See *Stripling v. Jordan Prod. Co.*, 234 F.3d 863, 873 (5th Cir. 2000). The district court never made that determination. Its entire futility analysis was a single clause: amendment would be futile "for the aforementioned reasons." ROA.536. Those reasons addressed only the sufficiency of the operative pleading; they said nothing about whether an amended complaint with additional allegations could survive Rule 12(b)(6). Because futility turns on the viability of the proposed amendment—not the deficiencies of the existing one—that analysis was legally insufficient to support dismissal with prejudice of an initial complaint filed without any prior opportunity to cure.

Second, at the Rule 12(b)(6) stage, characterization of a dismissal as purely academic, mixed academic and conduct-based, or purely conduct-based is a factual inference that must be drawn in the plaintiff's favor, not a legal conclusion the court may impose in the defendant's favor. As the complaint alleges, the University's operative dismissal document accused Dr. Doe of dishonesty, misleading statements, policy violations, and failures of professional responsibility—the vocabulary of discipline, not academic evaluation. The district court nonetheless treated the dismissal as purely academic as a matter of law, invoked *Horowitz* deference, and bypassed the procedural due process analysis that, under *Goss v.*

*Lopez* and *Dixon v. Alabama State Board of Education*, conduct-based accusations require. That ruling resolved a disputed material question against the plaintiff at the threshold stage and cannot be sustained under Rule 12(b)(6).

Third, *Ex parte Young* does not require a plaintiff to identify a single official with unilateral authority to provide complete relief. It requires a sufficient connection between the named official and the ongoing conduct or conditions producing the injury. See *Jackson v. Wright*, 82 F.4th 362, 370–71 (5th Cir. 2023). The district court imposed a more demanding standard—effectively requiring that each defendant possess plenary authority over reinstatement, records, and program access. Neither Article III nor *Ex parte Young* supports that requirement. The complaint identifies officials currently responsible for administering the records, appeals, committee processes, and program access underlying Dr. Doe's ongoing injuries. That connection satisfies *Ex parte Young* at the pleading stage.

Any one of these errors independently requires reversal. Together, they operated to extinguish a plausibly pleaded constitutional challenge before amendment, before discovery, and before the factual record necessary to test the University's justifications could be assembled. The judgment should be reversed and the case remanded or, at minimum, vacated with instructions to permit amendment.

# ARGUMENT

## I. THE DISTRICT COURT ABUSED ITS DISCRETION BY DISMISSING THE INITIAL COMPLAINT WITH PREJUDICE BASED ON A CONCLUSORY AND MECHANISTIC FUTILITY DETERMINATION.

### A. Futility Was the Sole Basis for the District Court's With-Prejudice Dismissal.

Although leave is not automatic, Fifth Circuit precedent recognizes that district courts often afford at least one opportunity to cure pleading deficiencies before final dismissal unless the defects are incurable or amendment would be futile. See *Great Plains Trust*, 313 F.3d at 329; *Hitt*, 561 F.2d at 608.

Additionally, dismissal with prejudice of an initial complaint ordinarily requires either a determination that amendment would be futile or some other recognized justification for denying an opportunity to amend. Although a district court may conclude that amendment would be futile, futility exists only if an amended complaint would fail to state a claim upon which relief can be granted. See *Stripling*, 234 F.3d at 873 (5th Cir. 2000). Accordingly, when a court permanently forecloses amendment at the outset of a case, it must have a legally sufficient basis for concluding that amendment could not cure the identified deficiencies. See *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Hitt*, 561 F.2d at 608.

That principle controls here. The district court dismissed Dr. Doe's initial complaint with prejudice and offered only a single reason for doing so: amendment would be futile "for the aforementioned reasons." ROA.536. The court identified no

undue delay, bad faith, repeated failure to cure deficiencies, prejudice, or other circumstances that might justify terminating the action with prejudice. Futility was therefore the sole basis for dismissal, making the validity of that determination dispositive of the judgment.

**B. The District Court Conflated Pleading Deficiencies with Futility.**

The district court's futility ruling collapsed two distinct inquiries: whether the existing complaint stated a claim, and whether an amended complaint could do so. It treated deficiencies in the existing complaint as equivalent to deficiencies that would necessarily persist in an amended one. The court did not conclude that Dr. Doe's claims were foreclosed as a matter of law. Rather, it found the complaint insufficiently pleaded in several respects. But pleading deficiencies do not automatically establish futility. The relevant question is whether additional factual allegations could cure the perceived defects. See *Stripling*, 234 F.3d at 873.

The record demonstrates that such allegations were available. Most notably, the University's July 11, 2025 Supplemental Notice accused Dr. Doe of "conduct inconsistent with program policies" and "repeated inconsistencies and misleading information" regarding attendance and clinical logs. ROA.31–32. Those allegations plausibly concern dishonesty, policy violations, and professional misconduct—not merely academic performance. At minimum, they prevent the dismissal from being characterized as purely academic as a matter of law at the pleading stage.

Additional information concerning the University's notices, governing policies, internal procedures, decision-making process, and related records likewise supplied facts bearing directly on the adequacy of notice, the neutrality of the decisionmakers, and the availability of prospective relief. Because those allegations bear directly on the deficiencies identified by the district court, the court lacked a sufficient basis to conclude that amendment would necessarily be futile.

Yet the district court never undertook that inquiry. Its entire futility analysis consisted of a single clause stating that amendment would be futile "for the aforementioned reasons." ROA.536. That explanation addressed only why the court believed the existing complaint failed; it did not explain why an amended complaint would necessarily fail as well. Futility, however, requires precisely that determination. See *Stripling*, 234 F.3d at 873.

The distinction is critical. A complaint may be inadequately pleaded yet still capable of being cured through amendment. Here, the district court collapsed those inquiries into one. Because it never meaningfully considered whether additional allegations could remedy the perceived defects, its conclusory finding of futility cannot sustain the dismissal with prejudice of Dr. Doe's initial complaint.

**C. The Available Additional Allegations Demonstrate Why Amendment Could Not Properly Be Deemed Futile.**

Appellees cannot salvage the district court's ruling by pointing to prior counsel's failure to file a formal motion for leave to amend. The issue is not whether

the district court failed to rule on a pending motion. The issue is whether the court could dismiss Dr. Doe’s initial complaint with prejudice based on futility without undertaking the analysis that futility requires. It could not.

Futility is inherently forward-looking. It requires a determination that an amended complaint would fail to state a claim upon which relief can be granted. See *Stripling*, 234 F.3d at 873. Yet the district court had no amended complaint before it, considered no proposed additional allegations, and conducted no analysis of whether amendment could cure the perceived deficiencies. Instead, it concluded in a single sentence that amendment would be futile “for the aforementioned reasons.” ROA.536. That reasoning assumes, rather than demonstrates, that the deficiencies identified in the original complaint would necessarily persist in any amended pleading.

The record reveals otherwise. An amended complaint would allege and expand upon the University's July 11, 2025 Supplemental Notice, which accused Dr. Doe of “conduct inconsistent with program policies” and “repeated inconsistencies and misleading information” regarding attendance and clinical logs. ROA.31–32. Those allegations substantially strengthen the plausibility of Dr. Doe’s contention that the dismissal rested, at least in part, on conduct-based accusations rather than purely academic judgment.

Additionally, an amended complaint would identify and further clarify specific procedural irregularities reflected in the University's governing documents, including provisions governing committee composition and voting authority allegedly violated by Dr. Jeong's participation as a voting member. ROA.29. Those allegations would materially strengthen the claim that the proceedings carried a significant risk of erroneous deprivation.

Furthermore, the University's own records would permit Dr. Doe to allege that conduct-based accusations emerged only after she objected that a newly imposed master's thesis and research project requirement conflicted with the 75% protected research time guaranteed by her NIH-supported appointment. At the pleading stage, that chronology supports an inference that the University's stated justification evolved over time—and became retaliatory in nature.

Nor are those the only available amendments. Dr. Doe could further allege with greater specificity the records and policies the University failed to disclose. She could also plead the Dean's contemporaneous written concerns regarding a "lack of due process." ROA.28–29. In addition, she could identify the contractual and institutional sources of her property interest and set out the facts supporting her liberty interest claim. She could further allege the continuing authority of each defendant over reinstatement, records, or program access. And she could assert a retaliation claim based on the emergence of adverse actions after she objected to the

master's degree and additional research project requirement and the resulting interference with her federally protected research time.

Importantly, although Dr. Doe personally experienced the events underlying her claims, she did not have access at the time of filing to the University's internal notices, policies, records, or procedural materials that bear directly on the deficiencies the district court identified. Nor had those facts been organized, clarified, or pleaded in a manner that tied them to specific constitutional violations. The availability of additional factual details, documentary support, and properly structured allegations confirms that the deficiencies in the original complaint were curable through amendment—not that amendment would have been futile.

Put simply, the district court never analyzed whether an amendment would survive Rule 12(b)(6), as *Stripling* requires, and the deficiencies the district court identified were pleading-level issues that could have been cured through amendment.

To be sure, whether those allegations ultimately prove meritorious is not the question. The question is whether the district court had a sufficient basis to conclude that amendment would necessarily be futile. Given the substantial additional allegations available to Dr. Doe, the answer is no. By equating deficiencies in the original complaint with deficiencies that would necessarily persist in any amended

complaint, the district court exceeded the limited inquiry that futility permits and improperly dismissed the action with prejudice.

**D. Prior Counsel's Failure to Request Leave to Amend Does Not Alter the Futility Analysis or Justify With-Prejudice Dismissal.**

Even absent a formal motion for leave to amend, dismissal with prejudice at the pleading stage is disfavored where the identified defects may be curable and no substantial reason exists to foreclose amendment. See *Great Plains Trust*, 313 F.3d at 329; *Hitt*, 561 F.2d at 608–09. That principle is particularly applicable here because the district court did not merely dismiss the complaint; it expressly denied any opportunity to amend on the ground of futility. Having chosen futility as the basis for terminating the action with prejudice, the court was required to undertake the inquiry futility demands: whether an amended complaint would fail to state a claim under Rule 12(b)(6). See *Stripling*, 234 F.3d at 873.

The district court did not perform that analysis. It declared amendment futile "for the aforementioned reasons," but those reasons addressed only the perceived deficiencies in the operative complaint. ROA.536. They did not explain why an amended complaint containing additional factual allegations would necessarily fail to state a claim. That distinction is critical. Futility turns on the viability of the proposed amendment, not merely the insufficiency of the existing pleading.

Nor does prior counsel's failure to file a formal motion for leave cure the analytical deficiency in the district court's ruling. This is not a case in which the court

simply overlooked an unrequested opportunity to amend. The court expressly reached the amendment question and resolved it adversely to Dr. Doe. That ruling can stand only if the record demonstrates that amendment would necessarily have been futile. See *Stripling*, 234 F.3d at 873. Because the district court never made that determination—and because the additional allegations available to Dr. Doe directly address the deficiencies identified in the dismissal order—the court lacked a sufficient basis to terminate the action with prejudice. At minimum, the proper disposition was dismissal without prejudice.

## II. THE DISTRICT COURT ERRED BY CHARACTERIZING DR. DOE'S DISMISSAL AS PURELY ACADEMIC AND INVOKING ACADEMIC DEFERENCE AT THE PLEADING STAGE.

This appeal presents a narrow question: whether the complaint plausibly alleged a dismissal that cannot be characterized as purely academic as a matter of law. The University's operative dismissal notice accused Dr. Doe of dishonesty, misleading information, and policy violations — not deficient clinical skills or academic underperformance. The district court nonetheless accepted the University's preferred characterization, applied the most deferential constitutional framework available, and dismissed the complaint. That sequence of errors — treating a disputed factual question as resolved, against the nonmovant, at the threshold — violated both Rule 12(b)(6) and the constitutional principles governing student discipline.

**A. The Complaint Plausibly Alleged a Conduct-Based or Mixed Dismissal.**

A Rule 12(b)(6) motion tests the complaint, not the defendant's competing account. See *Bell Atl. Corp.*, 550 U.S. at 555–56; *Ashcroft,* 556 U.S. at 678. The court was therefore required to accept Dr. Doe's allegations as true and draw all reasonable inferences in her favor. See *Fernandez-Montes*, 987 F.2d at 284.

The University's final dismissal notice — the July 11, 2025 Supplemental Notice — accused Dr. Doe of "conduct inconsistent with program policies," "repeated inconsistencies and misleading information," attendance and clinical-log discrepancies, and failures of administrative and professional responsibility. Those are not grades. They are not clinical skill assessments. They are accusations of dishonesty, non-compliance, and rule-breaking — the vocabulary of discipline, not academic evaluation. ROA.31–32.

The district court focused on the events that initiated the remediation process rather than the grounds ultimately invoked to justify dismissal. The notice, however, supplied the reasons on which the University ultimately relied. What matters is what the University said when it dismissed her. The Supplemental Notice — not earlier communications — supplied the final, formal grounds for termination. And those grounds, accepted as true, plausibly established that the dismissal was conduct-based or mixed, not purely academic.

Dr. Doe was not required to prove her characterization at the pleading stage. She was required only to allege facts showing that purely academic treatment could not be imposed as a matter of law. She did.

Nor is it an answer to say that some allegations touched on academic or clinical performance. The complaint does not allege a purely disciplinary dismissal; it alleges a dismissal that rested, at least in part, on accusations of dishonesty, misleading information, policy violations, and failures of professional responsibility. At the pleading stage, the presence of substantial conduct-based allegations is enough to preclude characterization of the dismissal as purely academic as a matter of law. Whether the University's decision ultimately reflected academic judgment, disciplinary concerns, or some combination of both is a factual question that cannot be resolved against the nonmovant on a Rule 12(b)(6) motion.

**B. *Horowitz* Should Not Govern as a Matter of Law.**

In *Board of Curators of the Univ. of Mo. v. Horowitz*, the Supreme Court afforded judicial deference to university decisions resting on academic judgment, which includes a student's mastery of curriculum, clinical aptitude, and professional fitness as assessed through the educational process. 435 U.S. 78, 87–91 (1978). However, *Horowitz* distinguished academic dismissals from disciplinary sanctions and applied reduced procedural requirements because the dismissal rested on academic judgment. See *id.* at 86-91. Moreover, academic deference is an exception

to ordinary procedural due process analysis, not its default replacement, and it applies only when the dismissal rests on academic judgment.

When dismissal rests on accusations of misconduct, a different body of law governs. *Goss* requires notice and an opportunity to be heard before suspension for conduct violations. 419 U.S. 565, 581–84 (1975). This Court has long held that expulsion from a public institution for misconduct requires notice and some opportunity for hearing. See *Dixon v. Ala. State Bd. of Educ.*, 294 F.2d 150, 157–58 (5th Cir. 1961); *Plummer v. University of Houston,* 860 F.3d 767, 773–74 (5th Cir. 2017). Where the dismissal notice accuses a student of dishonesty and policy violations — as here — *Dixon*, *Goss*, and *Plummer* supply the closer analogy.

The district court assumed the answer to the threshold characterization question and then used that assumption to apply the framework most favorable to the defendants. Rule 12(b)(6) permits neither. By characterizing the dismissal as purely academic and invoking *Horowitz* deference before any factual development, the court resolved a disputed issue against the plaintiff at the outset — precisely what the motion-to-dismiss standard forbids.

The University will likely argue that the dismissal was ultimately academic because it involved concerns regarding professionalism, responsiveness to feedback, judgment, and related attributes commonly associated with professional education. But that argument merely underscores why dismissal at the pleading stage was

improper. The complaint alleges that the operative dismissal notice relied on accusations of dishonesty, policy violations, misleading statements, attendance irregularities, and other misconduct-based charges. Whether those allegations are best characterized as academic deficiencies, disciplinary infractions, or some combination of both presents a fact-intensive question that cannot be resolved on a Rule 12(b)(6) motion by drawing inferences in the defendants' favor.

At bottom, the allegations support competing characterizations of the University's actions. That uncertainty precludes dismissal with prejudice based on futility and requires that the complaint be evaluated under the ordinary pleading standards governing Rule 12(b)(6).

**C. Dr. Doe Plausibly Alleged Protected Property and Liberty Interests.**

Property interests do not arise from the Constitution itself. Rather, they stem from "existing rules or understandings" derived from state law, institutional commitments, and mutually explicit understandings. See *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972); *Perry v. Sindermann*, 408 U.S. 593, 601–02 (1972). At this stage, the question is not whether Dr. Doe will ultimately establish the existence of a protected property interest. The question is whether the complaint plausibly alleged one. It did.

The complaint alleges that Dr. Doe occupied an integrated residency and research position governed by a formal offer letter, institutional program

requirements, and NIH-related commitments central to a federally funded dentist-scientist pathway to independence, which integrated residency training as 25% of her faculty duties as career development. The University expressly agreed to waive the program's master's-degree requirement, confirming in writing that “[t]he Master’s degree will be waived and that portion of time will be dedicated to your research efforts.” ROA.22. The University likewise represented to the NIH that Dr. Doe would receive 75% protected research time and that the residency would “not interfere with her research career development effort.” ROA.18–19. Those written commitments plausibly constitute the type of “existing rules or understandings” and “mutually explicit understandings” recognized in *Roth* and *Perry*. They describe considerably more than a unilateral expectation of continued enrollment.

Moreover, courts addressing educational dismissals have often assumed, deferred, or bypassed the protected interest question where the allegations otherwise plausibly implicate due-process concerns. See *Horowitz*, 435 U.S. at 84–85; *Regents of University of Michigan v. Ewing*, 474 U.S. 214, 222–23 (1985); *Pickett v. Texas Tech University Health Sciences Center*, 37 F.4th 1013, 1034–35 (5th Cir. 2022). In that context, the dispositive constitutional inquiry frequently becomes whether the institution employed procedures sufficient to guard against an erroneous deprivation.

That approach was particularly appropriate here. Dr. Doe's alleged interest arose not from enrollment alone, but from a unique combination of written

institutional commitments, federally mandated grant obligations, protected research time, and representations made both to Dr. Doe and to the National Institutes of Health. Whether those interests ultimately qualify as protected property interests need not be definitively resolved at the pleading stage because the complaint plausibly alleges that, whatever the precise contours of those interests, the procedures employed were constitutionally inadequate.

The complaint likewise plausibly alleges a protected liberty interest. Although reputational harm alone does not ordinarily trigger due-process protection, *Roth*, 408 U.S. at 573–74 (recognizing that government-imposed stigmatizing charges can implicate a protected liberty interest), the complaint here alleges far more than abstract reputational injury. The University's July 11 Supplemental Notice—the operative dismissal document—accused Dr. Doe of providing “misleading information,” engaging in “repeated inconsistencies,” and acting in a manner “inconsistent with program policies,” and those findings were incorporated into the dismissal decision itself. ROA.31–32, 34.

The complaint further alleges that these integrity-based findings now accompany Dr. Doe into future residency applications, NIH reviews, and academic-employment opportunities, impairing her ability to pursue the professional positions for which she has spent more than two decades preparing. ROA.325. The alleged injury is therefore not abstract reputational damage, but the ongoing foreclosure of

concrete educational and professional opportunities arising from a governmental determination of dishonesty and misconduct.

Courts in this context have often assumed, deferred, or declined to resolve the protected interest question at the pleading stage where the allegations otherwise plausibly implicate due process concerns. See *Horowitz*, 435 U.S. at 84–85; *Ewing*, 474 U.S. at 222–23; *Pickett,* 37 F.4th at 1034–35.

**D. The Complaint Plausibly Satisfied All Three *Mathews* Factors.**

Once the dismissal is properly characterized as conduct-based or mixed, the relevant question is whether the procedures alleged were constitutionally adequate under *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). Each factor supports Dr. Doe's claim.

**Private Interest.** The interest at stake is not merely continued enrollment in a graduate program. Dr. Doe lost an integrated residency and research appointment tied to approximately $1.57 million in NIH funding, a specialized professional career she had spent more than two decades developing, and a federally funded dentist-scientist pathway that cannot readily be replicated elsewhere. ROA.18–19. The complaint further alleges that the dismissal may reduce her R00 funding from five years to three, eliminating two years of independent research support and impairing her ability to generate data, publish research, compete for future grants, and obtain tenure. ROA.49. Where dismissal rests on allegations of dishonesty and professional

misconduct rather than academic underperformance alone, the consequences extend beyond educational status and affect professional reputation, future licensure opportunities, research productivity, and career advancement. The private interests implicated here are substantial.

**Risk of Erroneous Deprivation.** The complaint alleges a correspondingly high risk of error. The University accused Dr. Doe of "repeated inconsistencies and misleading information" and "conduct inconsistent with program policies," yet allegedly identified no specific false statement, contradictory record, date, or policy violation. ROA.31–34. She received approximately seventy-two hours' notice of the probation hearing, was denied access to the clinical and examination records underlying the charges and was refused even a brief extension to review those materials. ROA.27–28.

The complaint further alleges that an unauthorized committee member participated in the proceeding and that key decisionmakers had prior communications with the complaining supervisor. ROA.29. These allegations, if true, describe a process that afforded limited opportunity to test the factual basis of the charges before severe consequences were imposed. Significantly, the University's Dean allegedly described the situation contemporaneously as involving a "lack of due process—lack of feedback, lack of documentation." ROA.28–29. At

the pleading stage, those allegations strongly support an inference that additional procedural safeguards would have materially reduced the risk of error.

**Government Burden.** The complaint plausibly alleges that the burden of additional safeguards would have been minimal. The University already possessed the records and information upon which it relied. Providing access to those materials, identifying the specific statements deemed misleading, complying with committee-composition requirements, and furnishing adequate factual notice before imposing discipline would have required little additional administrative effort. The alleged safeguards are neither novel nor burdensome; they are ordinary procedural measures designed to promote accurate decision-making.

Taken together, the complaint plausibly alleges a procedural due process violation under Mathews. Because the district court resolved the academic-versus-disciplinary characterization against Dr. Doe as a matter of law and therefore never conducted the *Mathews* analysis, that error independently warrants reversal.

## III. THE DISTRICT COURT APPLIED AN UNDULY NARROW VIEW OF ARTICLE III REDRESSABILITY UNDER *EX PARTE* YOUNG.

The district court dismissed the official-capacity defendants because no single administrator possessed unilateral authority to reinstate Dr. Doe, expunge her records, and restore every aspect of her professional status. ROA.532. That was the wrong inquiry. Article III asks whether the requested relief would likely alleviate an ongoing injury; *Ex parte Young* asks whether the named officials have a sufficient

connection to the challenged conduct or its continuing effects. Neither doctrine requires a plaintiff to identify one official with plenary power to remedy every consequence of an unconstitutional dismissal.

**A. Article III and *Ex parte Young* Do Not Require Unilateral Authority**

Redressability is not an all-or-nothing requirement. A plaintiff need not show that a favorable judgment will eliminate every injury, or that each defendant can provide complete relief standing alone. It is enough that the requested relief would likely reduce or alleviate a concrete injury. See *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 181 (2000).

The same principle governs the *Ex parte Young* analysis. The relevant question is not whether one university official can personally undo every consequence of Dr. Doe's dismissal. It is whether the official has a sufficient connection to the enforcement, administration, implementation, or continuing effects of the challenged action. See *Jackson*, 82 F.4th at 370–71. In a university setting, that connection may arise from governing, supervisory, or operational authority over the program, records, appeal process, committee procedures, or other institutional mechanisms through which the challenged decision continues to injure the plaintiff.

*Jackson* confirms that distributed university authority does not defeat prospective relief. There, this Court held that university regents had the required

connection because they possessed governing authority over the institution and supervisory authority over the officials whose actions allegedly continued to violate the plaintiff's rights. See *id.* at 370–71. The Court did not require the plaintiff to identify a single official with unilateral authority to restore every lost opportunity. It required only a sufficient connection between the defendants and the ongoing institutional conditions producing the injury.

That rule controls here. Universities act through deans, program directors, committees, chairs, and delegated administrative structures. If *Ex parte Young* required unilateral remedial authority, prospective relief would often be unavailable precisely where state institutions diffuse responsibility among multiple officials. That is not the law. Because Dr. Doe alleged that the Dean, Program Director, and committee officials remain connected to the program access, records, appeal determinations, committee processes, and institutional findings that continue to injure her, the complaint plausibly satisfied both Article III redressability and *Ex parte Young* at the pleading stage.

### B. The Complaint Plausibly Alleged the Requisite Connection to Ongoing Injuries.

The complaint identified officials whose present responsibilities are connected to the records, processes, decisions, and program access from which Dr. Doe seeks prospective relief.

Dean Hargreaves exercised authority over the final institutional appeal and denied Dr. Doe's challenge to the dismissal, even though he previously declined to intervene due to a purported conflict of interest. ROA. 35, 517. The complaint seeks relief directed not merely at a past decision but at the continuing consequences of that decision, including the maintenance of dismissal findings in institutional records and the denial of a constitutionally adequate review process. The Dean's connection therefore remains ongoing rather than purely historical.

Program Director Karakousoglou likewise possesses a concrete connection to the injuries for which prospective relief is sought. The complaint alleges that she exercised operational authority over the orthodontics residency program and Dr. Doe's access to it. ROA.502. Because Dr. Doe continues to be excluded from that program, relief directed toward reinstatement, renewed program access, or implementation of constitutionally adequate procedures would necessarily run against an official connected to the continuing exclusion.

Dr. Ruparel, as Chair of the Academic Evaluation Committee, is similarly connected to the challenged process. ROA.33. The complaint challenges the procedures underlying the dismissal, including notice, access to evidence, committee composition, and the opportunity to respond. Relief requiring reconsideration through constitutionally adequate procedures or correction of findings produced

through an allegedly defective process would directly implicate responsibilities associated with the committee structure she chaired.

These officials are not sued merely because they participated in past events. They are sued because the complaint plausibly alleges that they remain connected to the institutional records, appeal determinations, committee processes, and program access that continue to produce the injuries for which prospective relief is sought.

At a minimum, those allegations satisfy *Ex parte Young* at the pleading stage. If additional details regarding the University's internal allocation of authority was necessary, the proper course was amendment and factual development—not dismissal with prejudice.

**C. The Requested Relief Is Prospective and Permissible Under *Ex parte Young*.**

The complaint seeks relief directed at ongoing injuries, not merely completed past events. Dr. Doe remains excluded from the residency program, and the challenged findings remain embedded in institutional records that allegedly impair her ability to obtain future residency placements, faculty appointments, research opportunities, and career development positions. ROA.33–35. Those continuing consequences are present injuries capable of prospective redress.

Reinstatement is a paradigmatic form of prospective relief permitted under *Ex parte Young*. See *Nelson v. University of Texas at Dallas*, 535 F.3d 318, 322–24 (5th Cir. 2008). So too are correction, expungement, or reconsideration of institutional

findings when those findings continue to produce present educational or professional consequences. The relevant question is not whether the requested relief erases every consequence of the challenged dismissal. It is whether the relief would likely alleviate ongoing injuries. Article III requires no more.

That standard is easily satisfied here. Dr. Doe seeks reinstatement or renewed access to the residency program, correction or expungement of integrity-based findings, and constitutionally adequate procedures going forward. Each form of relief operates prospectively. Each is directed at continuing injuries. And each would alleviate at least some portion of the harm allegedly caused by the challenged conduct.

Because the complaint seeks prospective relief against state officials connected to the ongoing consequences of the dismissal, sovereign immunity does not bar the claims. See *Ex parte Young*, 209 U.S. at 155–60 (holding that federal courts may enjoin state officers from enforcing unconstitutional enactments and that such suits are not barred by sovereign immunity).

### D. Neither *Whole Woman's Health v. Jackson* Nor *City of Austin v. Paxton* Supports Dismissal.

The district court's reliance *on Whole Woman's Health v. Jackson* and *City of Austin v. Paxton* is misplaced because neither case resembles the university-administration context presented here.

*Whole Woman's Health* involved Texas S.B. 8's unusual private-enforcement mechanism. 595 U.S. 30 (2021). Because enforcement occurred through private civil actions, the Supreme Court concluded that most state officials lacked the enforcement connection necessary for *Ex parte Young* relief. 595 U.S. 30, 39–43 (2021). As this Court later recognized, that holding was tied to the statute's private-enforcement structure. See *Jackson*, 82 F.4th at 370. This case involves no comparable arrangement. Dr. Doe challenges university decisions, institutional records, appeal determinations, and program access administered by university officials themselves. The alleged connection between the officials and the challenged conduct is therefore direct, not derivative.

*City of Austin v. Paxton* is distinguishable. There, the Attorney General's general authority to enforce Texas law was insufficient because he lacked any specific connection to the challenged conduct. 943 F.3d 993, 999–1000 (5th Cir. 2019). The officials here are not sued because they possess a generalized duty to comply with the law. They are sued because the complaint alleges that they remain connected to the residency program, the appeal process, the committee procedures, and the institutional records that continue to produce Dr. Doe's injuries.

Indeed, this case falls on the opposite side of the line from *City of Austin*. The connection alleged here is the type of concrete institutional relationship that Jackson held sufficient in the university context. The district court therefore erred by treating

*Whole Woman's Health* and *City of Austin* as barriers to relief rather than applying the controlling framework set forth in *Jackson*.

## CONCLUSION

Dr. Doe does not ask this Court to resolve disputed facts, determine the ultimate merits of her constitutional claims, or second-guess legitimate academic judgments. Nor must the Court do so to resolve this appeal. The questions presented are considerably narrower: whether the district court could dismiss an initial complaint with prejudice based on a conclusory finding of futility, whether it could resolve a disputed characterization against the nonmovant at the Rule 12(b)(6) stage, and whether it could apply an unduly restrictive conception of prospective relief under *Ex parte Young*.

The answer to each question is no. Whatever the ultimate merits of Dr. Doe's claims, the Federal Rules did not permit the district court to terminate this action with prejudice before amendment, before discovery, and before the factual record could be developed. At a minimum, Dr. Doe was entitled to have her claims evaluated under the ordinary standards governing Rule 12(b)(6), Rule 15(a)(2), and *Ex parte Young*.

The Court need not decide whether Dr. Doe will ultimately prevail. It need decide only whether she was entitled to an opportunity to attempt to do so. Because the district court prematurely foreclosed that opportunity, the judgment should be

reversed and the case remanded for further proceedings. At a minimum, the judgment should be vacated and the case remanded with instructions to permit amendment.

Respectfully submitted,

/s/ Adam Lamparello
Adam Lamparello, Esq.
Counsel for Plaintiff–Appellant
Lamparello Law, Education, & Advocacy
201 Berkshire Road
Hasbrouck Heights, New Jersey 07604
(201) 317-5115
adam@lamparello-law.com

# CERTIFICATE OF SERVICE

I certify that on this 15th day of June, 2026, I electronically filed the foregoing Brief for Plaintiff–Appellant with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit using the appellate CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Adam Lamparello
Adam Lamparello
Counsel for Plaintiff–Appellant

## CERTIFICATE OF COMPLIANCE

1. Type-Volume Limitation: This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 7,733 words, excluding the parts of the brief exempted by Rule 32(f).

2. Typeface and Style Requirements: This brief complies with the typeface and style requirements of Federal Rule of Appellate Procedure 32(a)(5)–(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font, with double-spaced body text and single-spaced block quotations.

/s/ Adam Lamparello
Adam Lamparello
Counsel for Plaintiff–Appellant